ORANGE COUNTY COMPANY *vs.* FRANCIS H. APPLETON & another.

Suffolk.   March 11, 1929. — January 27, 1930.

Present: RUGG, C.J., CROSBY, PIERCE, CARROLL, & FIELD, JJ.

*Contract*, Construction, Performance and breach.  *Evidence*, Extrinsic affecting writing, Of fraud.  *Assignment*.

At the trial of an issue in a suit in equity wherein the plaintiff sought to establish a debt due from the defendant on account of his subscription to a syndicate agreement, the following facts appeared:  The agreement was signed by persons designated as managers and by the defendant and twenty other subscribers.  A sum of money was placed after each subscriber's name, that after the defendant's being $30,000.  The entire subscription was $300,000.  Its stated purpose was "providing such funds and credits as the Managers may find necessary or advisable for or in connection with the acquisition or development" of certain land and timber in Florida.  It gave the managers power to call for payment of subscriptions in whole or by instalments and to

"make any and all arrangements and perform any and all acts not inconsistent with the provisions hereof (even though not specifically provided for herein) in their opinion necessary or expedient to carry out the purposes of the Syndicate or to promote or to protect what they deem to be for the best interest of the Syndicate." The managers issued calls for payments of subscription with which the defendant did not comply. About two years after the making of the agreement, the managers submitted to the subscribers a plan for liquidation which provided for the formation of a corporation which would acquire the assets of the syndicate and assume its liabilities, and would issue for such assets preferred and common stock to be distributed among the "members and participants" in the syndicate, and additional stock for sale. Each subscriber, including the defendant, signed and delivered to the managers a document whereby he assented to the plan, requested liquidation of the syndicate in accordance therewith, and confirmed his obligations as "a member or participant" therein. A Massachusetts corporation accordingly was organized and the managers assigned to it in writing all assets of the syndicate, including rights against the subscribers under the syndicate agreement. The corporation as assignee brought the suit. By order of the judge, the jury found a certain sum to be due the plaintiff, and the judge reported the suit to this court. *Held*, that

(1) Evidence offered by the defendant, that he signed the syndicate agreement in reliance upon statements made to him by the managers that they were forming a syndicate which "was a very profitable proposition, and would require the investment of only a little money," and that "no call would be made upon him to pay any more than $1,000 per unit subscribed," was not admissible to modify the contract in writing;

(2) The mere fact, that common stock authorized to be issued by the corporation when organized had par value, did not constitute a defence for the defendant, as a variation from the liquidation agreement to which he had assented and which required that the common stock have no par value, where it appeared that the next day after organization and before the assignment by the managers to the corporation an amendment was adopted making the common stock of no par value;

(3) The mere fact, that the corporation was authorized to issue preferred stock in the sum of $450,000 was not a variation, fatal to the maintenance of the action, from the liquidation plan assented to by the defendant which called for $420,000 of preferred stock to cover the total syndicate subscription of $300,000 and $120,000 of new cash, where it appeared that the liquidation agreement also provided that the assets assigned should be paid for in "Preferred stock to the extent of the paid-up subscriptions of Syndicate members with interest" thereon, and such interest amounted to $23,000, and that the managers were given authority "to amend the above [liquidation] plan in respect to details";

(4) It appearing that in making the assignment the managers acted within the scope of the authority conferred on them by the sub-

scribers' assent to the liquidation agreement, the question, whether they acted within the scope of authority conferred upon them by the original syndicate agreement *was not considered;*

(5) It was proper to exclude evidence, offered by the defendant to prove that his assent to the liquidation plan was procured by fraud, that the managers told him "that the preferred stock of the new company was already fully subscribed; that he would not have to pay any money to the managers or to the new company"; that he "would receive $3,000 in preferred stock in the new company and a bonus of common stock for the money that he had already paid in": the subject matter of such statements was covered by the document embodying the plan, which needed no interpretation, and they did not tend to prove a collateral agreement, nor tend to prove fraud;

(6) The assignment to the plaintiff being valid and the action being on the original subscription agreement, evidence, offered by the defendant, that no preferred stock or common stock had been transferred or tendered to the defendant for the $3,000 which he paid to the syndicate managers, and that no request was made by the syndicate managers that he subscribe for stock in the new company, was immaterial and properly was excluded;

(7) The amount to be recovered by the plaintiff properly was not reduced by the value of shares of stock in the plaintiff corporation to which it would be entitled on liquidation of the syndicate;

(8) In the circumstances, it was proper to order the issue answered favorably to the plaintiff.

BILL IN EQUITY, filed in the Superior Court on May 10, 1928, and described in the opinion, in amendment of an action of contract begun by a writ dated March 30, 1928.

The syndicate agreement was signed by the "managers" and by twenty-one subscribers, and omitting the *in testimonium* clause was as follows:

We, the undersigned, hereunto sign our names and set our common seal at Boston, Massachusetts, this twenty-sixth day of August, 1924, as Subscribers, acting severally but not jointly, for the purpose of forming THE SOUTHERN LAND AND TIMBER SYNDICATE upon the terms and conditions hereinafter set out.

### I.

### FORMATION OF SYNDICATE

The Syndicate shall consist of the Subscribers as principals and the Managers, who shall act as agents for the

Subscribers within the limits of the powers herein contained.

The Syndicate shall be operative when not less than fifteen persons shall have signed these presents as Subscribers and when the Managers hereinafter named shall have signed these presents as Managers. The Syndicate shall continue until such time as it shall be declared by the Managers to be dissolved and the profits have been distributed and the liabilities discharged.

## II.

### PURPOSES

The Syndicate is formed for the purpose of providing such funds and credits as the Managers may find necessary or advisable for or in connection with the acquisition or development of something over thirty-three thousand acres of land and timber in Taylor and Orange Counties in the State of Florida.

## III.

### THE SUBSCRIBERS

The Subscribers, acting severally but not jointly, each hereby subscribes for the purposes of the Syndicate 10,000 or such larger amount as he may set against his name, and agrees with the Managers to pay over the same in full at any time, or in installments from time to time, to the Managers, or to their order, upon ten days' notice from the Managers, and the Subscribers do hereby each for himself, severally but not jointly, appoint the Managers their agents and attorneys in fact with power to borrow money for the purposes of the Syndicate to the extent in principal amount, and in the manner hereinafter provided. In the event that the Managers shall so borrow money, the Subscribers (in addition to the principal amount of their respective subscriptions) shall respectively in proportion to the amounts of their subscriptions be liable for, and hereby agree with the Man-

agers to pay to the Managers on their demand forthwith, an amount equal to the interest on all sums of money so borrowed.

Nothing herein contained shall constitute the Subscribers hereto partners by reason of their subscribing hereto, and no party hereto shall have any power to bind any other party hereto excepting as and to the extent herein given to the Managers.

Additional Subscribers may be added from time to time in the discretion of the Managers.

The term "Subscribers" shall include the original Subscribers hereto and any Subscribers who hereafter may be substituted therefor or added thereto.

The Subscribers shall each be entitled to examine the books and accounts of the Managers at any time.

## IV.

### The Managers

The Managers of the Syndicate shall be: —

> Leavitt C. Parsons of Brookline, Mass.
> Shirley S. Philbrick of Rye Beach, N. H.
> Charles S. Baxter of Boston, Mass.

The Managers shall not be personally liable under any of the provisions hereof nor for any matter connected herewith excepting for want of good faith in the exercise of their powers hereunder. The Managers may, however, become Subscribers and as such shall be liable for any subscriptions by them made and shall in all respects be entitled to the same rights and benefits and be subject to the same liabilities as other Subscribers. Any property held by the Managers hereunder is hereby declared by them to be held as agents for the Subscribers and for the purposes of the Syndicate.

In the event of death, resignation or incapacity of any of the Managers or their successors, the surviving Manager or Managers may nominate a successor or successors, and such nomination shall become effective when

confirmed in writing by a majority in amount of the Subscribers. The number of Managers may be increased to five, the additional two Managers to be chosen by a majority of the subscribers provided it may seem advisable.

The term "Managers" shall include the original Managers and their successors and substitutes.

## V.

### POWERS OF THE MANAGERS

The Managers shall have the sole power and discretion to determine upon the properties to be acquired and developed for the purposes of the Syndicate and the manner, extent and means of such acquisition and development. It being the main purpose of the Syndicate to acquire and develop the properties set forth in a Prospectus called an "Investment Proposal with financial plans for acquiring and developing thirty three thousand acres of land and timber in Taylor and Orange Counties, in the State of Florida. Said Prospectus being dated Boston, July 10, 1924." The managers shall have power in their sole discretion to call upon the Subscribers for payment in full at any time, or in installments from time to time, up to the aggregate amount of their respective subscriptions, plus interest as aforesaid. In calling upon the Subscribers at any time for payment of the whole or a part of the unpaid balances of their respective subscriptions, the Managers shall make such calls upon all of the Subscribers in proportion to the amounts of their respective subscriptions. The money received by the Managers from the Subscribers to such calls for subscriptions shall be forthwith applied by the managers to the payment of any note or notes of the Syndicate at the time outstanding with interest thereon to the extent necessary therefor.

The Managers, as agents and attorneys in fact for the individual Subscribers, may borrow money from time to time for the purpose of the Syndicate on such terms and for such times as they in their discretion deem wise to

the extent in principal amount of, but not in excess of, any subscriptions hereunder at any time unpaid and may evidence such loans by negotiable notes. The Managers may pledge, as security for the repayment of any or all moneys advanced to the Syndicate, any and all property acquired by or in behalf of the Syndicate on such terms and conditions as they in their discretion deem wise.

The Subscribers shall be absolutely and unconditionally liable to any person so loaning money for the purposes of the Syndicate for the repayment thereof with interest thereon in proportion to their subscriptions remaining unpaid at the time such liability is sought to be enforced. Any person so loaning money shall have the right to institute and prosecute directly against the Subscribers or any of them whatever proceedings may be necessary in order to enforce the liabilities of any of them hereunder to pay the amount due for the repayment of such loans with interest; provided, however, that the Subscribers shall not in any event be jointly liable and shall not be severally liable for more than the amount of their respective subscriptions and interest obligations hereunder remaining unpaid at the time such liability is sought to be enforced; and provided further that the Managers shall not incur any personal liability by reason of their signing notes or arranging such loans as agents of the Syndicate.

The Managers may make any and all arrangements and perform any and all acts not inconsistent with the provisions hereof (even though not specifically provided for herein) in their opinion necessary or expedient to carry out the purposes of the Syndicate or to promote or to protect what they deem to be for the best interest of the Syndicate and each Subscriber assents to and agrees to be bound by such action; and any enumeration of the specific powers herein shall not be construed in any way to abridge the general powers of these presents conferred or intended to be conferred upon the Managers.

In the event of any disagreement between the Managers as to the exercise of their powers hereunder, they may act by majority decision.

## VI.

### PROFITS AND LOSSES

The profits of the Syndicate shall be divided as follows: — after the payment of all expenses, including taxes, if any, and after the repayment in full to the subscribers of their respective subscriptions plus interest at the rate of 7% per annum thereon, then ½ of the profits shall be divided among and paid over by the Managers to the Subscribers in proportion to the amounts of their respective subscriptions hereunder. The balance of the profits or ½ of the profits shall be retained by said Parsons, Philbrick and Baxter, or the survivor of them. The profits of the Managers shall then be divided as follows: — 50% of said profits shall go to said Parsons and Philbrick for their joint share of the final profits as compensation for the initial equity they turned into the Syndicate for the benefit of all subscribers in the transfer of the Taylor County properties and the Orange County properties. The remaining 50% of said ½ shall be divided in such proportion as the said Parsons, Philbrick and Baxter may agree.

If at any time prior to the termination of the Syndicate the Managers deem it advisable to make a partial distribution among the Subscribers of the profits of the Syndicate, they may do so in proportion to their subscriptions respectively. The subscribers shall bear losses, if any, in proportion to their subscriptions respectively.

## VII.

### DEFAULT BY SUBSCRIBERS

The failure of any Subscriber to pay his subscription or any part thereof or the performance of any obligation hereunder by him to be performed, shall cause his share, together with all the profits thereon, to be forfeited to the Syndicate, but such failure shall not release such Subscriber nor any other Subscriber from his respective obligation hereunder.

## VIII.

### SUCCESSORS AND ASSIGNS

This agreement is for the benefit of and shall bind the legal representatives, successors and assigns of the respective parties hereto.

The defendant Appleton claimed a trial by jury, and moved that issues be framed for submission to a jury on the question of the establishment of the debt. The suit was tried before *Morton*, J. The plaintiff's evidence consisted of the documents described in the opinion and certain facts agreed to by the parties. Rulings by the judge excluding evidence offered by the defendant are described in the opinion.

At the close of the evidence, the judge framed for the jury the question stated in the opinion. The defendant moved that the jury be ordered to answer the question, "Nothing." The motion was denied. The defendant then asked for and the judge refused to give the following rulings:

"1. On all the evidence the plaintiff is not entitled to recover.

"2. The incorporation of the plaintiff company with a preferred capitalization of $450,000 is a fatal variance from the contract declared upon, which provided expressly for an issue of preferred stock, limited to $420,000, and this variance operates to release the plaintiff from his subscription."

"4. The Syndicate Managers had no power under the agreement of August 19, 1926, to alter the capitalization of the proposed new company, as fixed by that agreement.

"5. The incorporation of the plaintiff company with a capitalization of $400,000 of par value common stock, was a fatal variance from the plan of August 19, 1926, which releases the defendant from any obligation he may have had.

"6. Where the capital stock and the number of shares are fixed by the agreement or by the certificate of incorporation, no recovery can be had upon a subscription for the

capital stock until the whole number of shares has been subscribed."

"8. False representations made by a promoter of a new corporation as to proposed issue of stock are binding upon the company, and when formed it becomes responsible therefor."

The judge then, being of the opinion that there was no issue of fact for the jury, granted a motion by the plaintiff that a verdict be ordered for the plaintiff in the sum of $29,416.50, and reported the suit for determination by this court.

*E. O'Callaghan*, for the defendants.

*W. B. Luther*, (*G. M. Nead* with him,) for the plaintiff.

FIELD, J.    This is a bill in equity brought in the Superior Court to establish a debt alleged to be due to the plaintiff from the defendant Appleton on account of said defendant's subscription to a syndicate agreement and the assignment of this subscription to the plaintiff by the syndicate, and to reach and apply in satisfaction of this alleged debt certain shares in the defendant New England Equity Corporation alleged to belong to the defendant Appleton.    On the motion of the defendant Appleton, hereinafter referred to as the defendant, an issue was framed for submission to a jury on the question of the establishment of the debt as follows: "How much money does the defendant Appleton owe the plaintiff?"    The questions which are before us for determination arose in connection with the trial of this issue.

The plaintiff's evidence consisted of documents, the execution of which was admitted, and agreed facts.    The defendant offered evidence which was excluded, and made an offer of proof, a part of which proof was ruled to be inadmissible, and the evidence in support thereof excluded. The defendant moved that a verdict be directed for him on the issue submitted, asking that the jury be directed to answer "nothing."    This motion was denied.    The defendant made requests for rulings which were refused, and other requests which were given with the ruling that they were inapplicable to the facts presented.    On motion of the plaintiff, the judge directed a verdict for it for $29,416.50,

including $27,000, the balance due under the original syndicate subscription, and $2,416.50, interest thereon, the latter amount being reached by agreement, but without any admission by either party affecting the substantive case. To the exclusion of the defendant's evidence, the denial of his request for a directed verdict, the rulings and refusals to rule, and the direction of a verdict for the plaintiff, the defendant excepted. The judge reported the case.

Under date of August 26, 1924, various persons as managers and others, including the defendant, as subscribers executed an agreement for the formation of the Southern Land and Timber Syndicate for the purpose as therein recited of "providing such funds and credits as the Managers may find necessary or advisable for or in connection with the acquisition or development" of certain land and timber in Florida. The total subscription was $300,000, of which the defendant's subscription was $30,000, being three units of $10,000 each. The agreement included the power to make calls for payments, after ten days' notice, in full, or in instalments from time to time, of these subscriptions. At some time prior to January 1, 1925, the managers made a call for ten per cent of the subscriptions, in the case of the defendant, $3,000, which amount he paid. On February 2, 1925, they made a call for the balance of these subscriptions — in the case of the defendant, $27,000 — to be paid on October 24, 1925, and on August 31, 1926, sent to all the members and subscribers a call for the payment of thirty per cent of the full amount due of the subscriptions — in the case of the defendant, $9,000 — and again on November 5, 1926, for sixty per cent of such amount — in the case of the defendant, $18,000. The defendant has not made any payment in response to these calls.

On or about August 19, 1926, the managers submitted to all the "members and participants" in the syndicate, including the defendant, a document embodying a plan for liquidating it. This plan provided for the formation of a corporation to acquire the assets of the syndicate and assume its liabilities, and to issue preferred and common stock for such assets to be distributed among the "members

and participants" in the syndicate, and additional stock for sale. Each of the "members and subscribers" of the syndicate — among them the defendant — signed and delivered to the managers a document whereby he assented to the plan, requested liquidation of the syndicate in accordance therewith, and confirmed his obligations as "a member or participant" therein.

On July 14, 1927, the then surviving syndicate managers joined in executing an indenture by which they purported to assign to the plaintiff, a corporation organized on July 12, 1927, under Massachusetts laws, all the assets of the original syndicate, with certain exceptions not material to this case, including specifically "all unpaid subscriptions to said Syndicate and all rights of said Syndicate under or by virtue of said agreement of August 26, 1924, and/or the supplemental agreement of August 19, 1926 to collect from members any unpaid balances of their subscriptions" and the plaintiff purported to assume the liabilities of the syndicate. The plaintiff as such assignee seeks by this suit to recover from the defendant the balance of his subscription amounting to $27,000 with interest thereon.

The defendant does not contend that he was not bound by his original subscription, except so far as such a contention is presented by his exception to the exclusion of evidence of his conversation with the managers before he signed the syndicate agreement. He offered to prove that he signed the agreement in reliance upon statements made to him by the managers that they were forming a syndicate which "was a very profitable proposition, and would require the investment of only a little money," and that "no call would be made upon him to pay any more than $1,000 per unit subscribed," and excepted to the exclusion of this evidence. It is clear that this evidence was not admissible to modify the written contract of subscription and was excluded rightly. *Goldenberg* v. *Taglino*, 218 Mass. 357. *Starks* v. *O'Hara*, 266 Mass. 310.

The plaintiff's suit is brought upon the defendant's subscription to the syndicate — not upon a subscription to stock in the plaintiff corporation — and can be maintained

if the plaintiff has a valid assignment in writing of the syndicate's right to recover the unpaid balance thereof. G. L. c. 231, § 5. *Commonwealth* v. *Market Warehouse Co.* 250 Mass. 449, 452. Assignment by the managers of the assets of the syndicate including this right was authorized by the plan of liquidation of August 19, 1926, as assented to, and an assignment thereof in writing to the plaintiff was executed by them. The defendant contends, however, (a) that in making this assignment the managers did not act within the scope of the authority conferred upon them either by the agreement of August 26, 1924, or by the plan of liquidation of August 19, 1926, and (b) that the assent of the defendant to this plan was procured by fraud.

The defendant urges in support of his contention that the assignment was not within the scope of the syndicate managers' authority under the plan of liquidation, that this plan was not followed in the formation of the plaintiff corporation. Compare *Katama Land Co.* v. *Jernegan*, 126 Mass. 155.

According to the plan the capital of the corporation to be formed to take over the assets of the syndicate was to consist of "$420,000 of Preferred stock to cover the total Syndicate subscriptions amounting to $300,000 and $120,000 of new cash, and 120,000 shares of Common stock, of which 18,000 shares will be returned to the New Company's treasury for its use in selling $120,000 Preferred stock at par." The preferential features of the preferred stock issue were set forth with much detail. The common stock was to be without par value. It was further provided in the plan that the new corporation should "pay for the assets acquired by payment or assumption of liabilities outstanding, by the issue of Preferred stock to the extent of the paid-up subscriptions of Syndicate members with interest at 7% per annum . . . and by the issue of all of its common stock," and that the managers "reserve the right to amend the above plan in respect to details."

The plaintiff's certificate of incorporation dated July 12, 1927, provided for "an authorized capital stock of eight hundred and fifty thousand dollars, consisting of forty-five

hundred shares of preferred stock, par value one hundred dollars, and four thousand shares of common stock, par value one hundred dollars." The next day an amendment was adopted substituting one hundred and twenty thousand shares of common stock without par value for the par value common stock previously provided for, and the following day the assignment was made. On August 6, 1927, thirty-two hundred and thirty preferred shares and one hundred and twenty thousand common shares were issued for the benefit of the syndicate of which three thousand shares of the preferred stock represented the amount of the total subscriptions to the syndicate, "and two hundred and thirty shares . . . the amount proposed to be issued to the Syndicate subscribers to cover interest at the rate of seven per cent per annum upon the subscriptions."

The authorized capital, therefore, at the time of the assignment was in accordance with the plan. The common stock then authorized was one hundred and twenty thousand shares without par value, as the plan required. It is immaterial that for one day before the date of the assignment the charter provided for common stock with par value. Nor was the authorization of a preferred stock issue of the par value of $450,000 a variance from the plan. The provision therein for an issue of preferred stock of $420,000 par value to cover "Syndicate subscriptions amounting to $300,000 and $120,000 of new cash" is to be read with the provision that the assets assigned shall be paid for in "Preferred stock to the extent of the paid-up subscriptions of Syndicate members with interest" thereon. Such interest amounted to $23,000. A further $7,000 of par value, doubtless intended to make the amount of the issue a round figure, was within the authority reserved to the syndicate managers "to amend the above plan in respect to details." Moreover, the amount of stock actually issued to the agent of the syndicate for its benefit in exchange for its assets met the requirements of the plan, and the issue was not invalidated by the fact that this agent was also the treasurer of the plaintiff corporation. The agreement of the parties that "preferred shares" were so issued must be taken to

mean shares containing the preferential features called for by the plan.

Whatever may be the rights and obligations of the syndicate or of any of its members or participants under the plan after the formation of the plaintiff corporation and the issue of its stock to the syndicate, no condition precedent to the assignment of the syndicate assets was fixed by the plan which has not been performed. The plan did not require that the preferred stock to be issued for cash be fully subscribed before the assignment was made. Each member of the syndicate was to have an opportunity to subscribe for such stock but steps were to be taken to carry out the plan. in reliance upon the fact, as recited therein, that "certain of the original subscribers" had "indicated their willingness to take up shares not subscribed for by the other participants." It was contemplated that immediate cash requirements would be met by payments on the original syndicate subscriptions, such as the defendant's subscription upon which this suit was brought. Members were not to be allowed to subscribe for the preferred stock to be issued for cash unless they had paid their syndicate subscriptions in full and these subscriptions might be collected by the syndicate or by the new company. Nor was it required that eighteen thousand shares of common stock be returned by the syndicate to the plaintiff before the assignment. Obviously these shares could not be returned before they had been issued in exchange for the assets assigned. It follows that in making the assignment the syndicate managers acted within the scope of their authority under the plan. Whether they acted within the scope of their authority under the agreement of August 26, 1924, need not be determined.

The defendant's contention that his assent to the plan of August 19, 1926, was procured by fraud is based wholly on an offer of proof of statements made to him by some of the managers. He offered to prove that three of them talked with him about the plan and told him "that the preferred stock of the new company was already fully subscribed; that he would not have to pay any money to the managers

or to the new company; . . . that the new company was completely financed by subscriptions of stock by others," and that he "would receive $3,000 in preferred stock in the new company and a bonus of common stock for the money that he had already paid in," and that he signed the assent to the plan in reliance on these representations. The defendant offered to show further "that the said preferred stock was not fully subscribed" at the time the plan was presented to him, "nor was the $120,000 in additional preferred stock," that "no preferred stock or common stock has been transferred or tendered to Appleton for the $3,000 which he paid to the syndicate managers; and that no request was made by the syndicate managers that he subscribe for stock in the new company prior to July 12, 1927."

The evidence offered was excluded rightly. The subject matter of the statements which the defendant offered to prove was covered by the document embodying the plan. They did not tend to prove a collateral agreement independent thereof. They were not admissible to vary the written instrument. *Goldenberg* v. *Taglino, supra. Starks* v. *O'Hara, supra.* Nor were they admissible to show that the defendant's assent to the plan was induced by fraud. The statement as to what the defendant was to receive under the plan and the statement that he "would not have to pay any money to the managers or to the new company" were inadmissible for this purpose because they were not affirmations of existing facts. *Loughery* v. *Central Trust Co.* 258 Mass. 172, 175, 177–178. Moreover the promise that the defendant would not have to pay any money was inconsistent with the express provisions of the plan, as were the statements that "the preferred stock . . . was already fully subscribed" and that "the new company was completely financed by subscriptions of stock by others." According to the plan the unpaid subscriptions to the syndicate were to be collected to finance the new corporation and all members of the syndicate were "invited" and "expected" to subscribe for preferred stock. The evidence did not tend to prove that the defendant assented to the plan by reason of any "fraud or misstatement as to the

nature" of the written instrument or "as to the meaning of the contents" thereof. It did not go beyond an attempt to vary the plan, for which purpose it could not be received. *DePasquale* v. *Bradlee & McIntosh Co.* 258 Mass. 483, 487–488. Since the statements were inadmissible, the evidence offered to show their falsity fell with them, and it was not material on any other issue in the case. Apart from this inadmissible evidence there was no basis for the contention that the defendant's assent to the plan was procured by fraud.

As there was a valid assignment to the plaintiff of the syndicate's right to collect the defendant's unpaid subscription thereto, and the distribution of the assets of the syndicate among its members was not a condition precedent to such collection, and as the suit is on this subscription the defendant's offer of proof that "no preferred stock or common stock has been transferred or tendered to Appleton for the $3,000 which he paid to the syndicate managers; and that no request was made by the syndicate managers that he subscribe for stock in the new company prior to July 12, 1927," was immaterial and excluded rightly. For the same reasons the amount to be recovered by the plaintiff is not to be reduced by the value of shares of stock in the plaintiff corporation to which it will be entitled on liquidation of the syndicate.

On the agreed facts and the documents in the case, in the absence of evidence that the defendant's assent to the plan was procured by fraud, the plaintiff was entitled to recover the unpaid balance of the defendant's subscription with interest. It follows that the refusal to direct a verdict for the defendant and the direction of a verdict for the plaintiff were right. *O'Meara* v. *Smyth,* 243 Mass. 188, 190.

The questions raised by the defendant's requests for rulings have been considered in connection with the motions for directed verdicts. There was no error in the disposition of them.

Since the rulings of the judge were right, according to the terms of the report, "an interlocutory decree is to be entered establishing the debt as of the date of the verdict in the

sum of $29,416.50, and the case is to be remanded to the Superior Court for further proceedings in connection with the plaintiff's prayers to reach and apply certain property in satisfaction of the debt."

*Ordered accordingly.*